a petitioner. Mr. Paradise for the petitioner, Mr. Duprieu for the respondent. Mr. Paradise for the petitioner, Mr. Duprieu for the respondent. Good morning, Your Honors, and may it please the Court. When Congress created the United States Supreme Court, it did so because it recognized that robust and independent appellate review would be essential if the military commission system was ever to have any legitimacy. We therefore ask this Court to salvage Congress's reforms by disqualifying Lieutenant Colonels Weber and Ward because they are constitutionally ineligible to serve as the independent federal appellate judges that they are for two specific reasons. First, when Lieutenant Colonels Weber and Ward went before the Senate as non-civilian nominees, they were part of pools of 2,000 and 1,000 other inferior officers, respectively. And Congress cannot, consistent with the Appointments Clause, delegate to the Secretary of Defense the authority to unilaterally reach down into those pools and elevate an inferior officer into a distinct, judicially independent principal office that Congress has created by law. And second, as military officers, Lieutenant Colonels Weber and Ward are subject to a civilian chain of command that extends from the Commander-in-Chief. And Congress cannot, pursuant to judicial independence or otherwise, immunize them from supervision and control by their military superiors with respect to their military activities. And because that is what the judicial independence provisions of the 2009 Act do, they are unconstitutional and must be struck. No, the statute says that for military necessity, they can be reassigned or used in any way that the Commander-in-Chief or his subordinates within the military would so see fit. It's a military necessity plus compliance with the services rotation, professional rotation. Which they comply with anyway. Does the compliance with the services rotation violate the Commander-in-Chief Clause? Well, no, because those regulations are always waivable. And in any other, certainly statutory, regulation of the duration of a particular assignment for a military officer, the President is given near unilateral authority to waive them at will. So you're saying codifying them in the statute renders them non-waivable here and therefore more rigid than would be consistent with the Commander-in-Chief? That's correct. And they're not waivable here. And so because of that, because they have essentially been judges that Congress wanted them to be, that Congress intended them to be, and that Congress created the U.S. Court of Military Commission Review in 2009 to ensure that they would be. And so for that reason, we ask that they be disqualified. And if there are no further questions, I would just reserve the remainder of my time. I think we may have questions. Oh, yes, please. Please, Your Honor. Why now? You know, we don't ordinarily exercise jurisdiction prior to final judgment, and there's some statutory authority directing us to exercise our appellate jurisdiction after final judgment. This seems like it's something that will be presented to us in due course. Well, this is the due course, primarily because writs of mandamus for the purpose of disqualification, indeed even other legal actions dealing with disqualification, are ordinarily and best heard before the systemic damage has been done. This Court certainly recognized that in Cobell v. Norton. But I think the Supreme Court's analysis of that very point you're making, Your Honor, in a free enterprise fund, which was an appointments clause case, the need to have responsibility and independence actually is, is important to resolve at the earliest possible opportunity. Isn't that really a call for the government to make? If the government is willing to take its chances that at the end of the day, this appellate body is going to be determined to be invalid under the appointments clause, why can't they make that decision? Well, because the Congress has determined that Mr. Al-Ashiri, my client, has the right to go before an independent appellate court. And so he is deprived of that right so long as the structural problems are resolved. Yeah. At the end of the day, he may win that argument. And isn't that what the statute gives him, is a right at the end of the day not to have a conviction upheld if the appellate body that would sustain it is not validly composed under the appointments clause? Why the timing? Why now? Well, again, the timing, I would say, looking to every precedent dealing with judicial disqualification, it's something we want to get resolved as early as possible. But aren't those cases mostly dealing with bias? And so the notion that all the discrete judgments going along might be affected by a judge who's biased. And here there's no such claim. Here it's a structural question. Sure. Those judges are doing their level best, but maybe they're not appointed validly. So why isn't that something that could be just as well fixed if it needs to be fixed at the end of the day? Sure, absolutely. And I would give you two reasons for that. One is your premise is somewhat incorrect. Some of the most important cases, including Cobell v. Norton and Free Enterprise Fund, did not deal with judicial claims of bias. They dealt with separation of process is essentially at its maximum here. Because if these individuals who are going to be deciding this appeal and potentially remanding charges back down to a capital trial, capital charges incidentally, to a capital trial, it will be structural error that will necessarily vacate the entire sentence he's given and could potentially vacate the conviction as well. And so in terms of all of the little incidental problems... At this point, though, it's not the entire. It's just one of the three charges that's before... It's five. Five of the charges are impacted by that. But dealing with one subset of the alleged conduct. And so your client is facing death penalty charges in any event without regard to what happens in this appeal. Is that not correct? That is correct. But the two points that I would focus on is one is it substantially broadens the scope of his capital exposure in this case. And that does... This Court... I don't know that there are any cases from this Court, but certainly the Second Circuit and the Ninth Circuit have recognized that capital cases present unusual pressures on a defendant. But those cases are not in the context of military trials. They're in the context of civilian trials. That's correct. Well, Toth v. Quarles and Reid v. Covert from the Supreme Court, both were pretrial challenges to the legality of the court's marshals in those cases. And Judge Harlan in his concurrence, I believe in Reid, made a special point of emphasizing the particular nature of a capital case, which does raise issues that are unique in kind to an ordinary case and the need for early prompt and getting it right the first time. Can you tell us a little bit more about that? Sure. In Reid v. Covert involved a wife of a servicemember who was charged, I believe, for murdering the servicemember. And she was charged before a court-martial under the Uniform Code of Military Justice, which authorized dependents to be prosecuted by court-martial, including for capital offenses. She was tried. She sought rid of habeas corpus and was ultimately granted that rid of habeas corpus. I believe from this court, but certainly from the Supreme Court, and again, on an interlocutory basis. Indeed, the vast majority... What I'm asking is, can you help us to understand the argument that you're making, that somehow the fact that your client is death eligible in these counts affects the analysis at all? Sure. And I'll give you one very particular example, which is unique to the military context, is because in the military context, sentencing is all-inclusive. There is no individual sentence. You don't get a sentence for each charge. You get convicted on whatever charges you get convicted of, and then you get an omnibus sentence that attaches to the entire judgment. So Mr. Al-Nashiri, if he's essentially charged with five extra capital crimes, he stands a far more likely chance of getting the death penalty on all of his crimes. Again, my point would be that's a risk that the government is facing. Well, it's a risk... And your client might, in fact, benefit from this being decided at the end of the day rather than now. I mean, it seems like if you're right that one of the beams in this edifice of trial that's being contemplated is already chewed on by termites and at the end of the day it's going to come crashing down. It's the government that should be concerned about that. Well, I certainly agree the government should be concerned about that, but when I have a client who is going to be potentially told by 12 members of the armed forces that he will be killed imminently, I think that is a unique and a special harm to him. But there are charges that are not implicated here that are charges carrying a potential penalty of death. So even if you were to win everything you're seeking today, that risk remains. And I understand you're saying, well, part of the support for the omnibus potential death penalty would be taken, but there's still a lot of charges there. So it's not going to change this from a death to a non-death case. It doesn't change it from a death to a non-death case, but it does change the scope of the case in very substantial ways. One is the sentencing issue I mentioned before. But in addition, the aggravating factors. There are five aggravating, statutory aggravating, or they're passed by regulation, but they're sort of the equivalent of statutory aggravating factors in a death case. At least one of them is being convicted of multiple capital crimes. And so that, in a very specific and particular way, does directly expand his eligibility for the death penalty. And again, Your Honor, I understand your point that maybe this is just the termite-eaten, ridden beam that five to ten years from now, in this case, ultimately gets to this court on post-trial review that will bring everything crashing down. I have trouble seeing exactly how that benefits my client, who has already been in custody for 14 years, if he has to be retried again ten years from now on charges that he claims his innocence for. And also, I think it's a grotesque waste of judicial resources. And if the government is willing to waste those resources, certainly Guantanamo has not been the most cost-effective means of prosecution. But I think this court can certainly look past those representations of what the government believes to be in its narrow, short-term interest, and to look at the public's interest in not only ensuring that justice is swift, or swifter, and not only that it's more cost-effective, but that the government at least tries to get it right the first time, and doesn't just bury as much error as it can into the record, so that when these cases crash into this court and get meaningful judicial review at the end of the day, that all of the convictions get vacated. And I think certainly in the Al-Balul and the Hamdan cases, there are substantial – one was vacated outright, and the other was substantially vacated unanimously by this court on issues that had meandered through the military commission system for the better part of a decade. And so certainly at the end of the day, this court has the discretion to issue a writ or not, but I think in terms of both the public interest as well as my client's interest, I think strongly augur in favor of doing – of resolving this at the earliest opportunity. And do we have the power to do it? We don't have any power to consider any action at this stage? You do, actually, because under Section 950G, this court is given jurisdiction as the appellate court of right over final judgments from the military commission. That language is in hoc verba from the parallel provision, Article 66 of the UCMJ, which governs courts, the role of the Court of Appeals for the Armed Forces and the interstitial criminal courts of appeal that sit on top of courts martial. And so certainly this court has the same jurisdiction. Well, what about the jurisdiction stripping? We don't have any jurisdiction until there's a final judgment. Well, this court doesn't have – this court has prospective jurisdiction. I would just point to In re Tenent as this court's sort of deepest analysis of that, as well as Morrow v. District of Columbia. I think both are cited in our reply brief. But with respect to Section 72 or 2241E2, this court held in Balboacha, this court has already held that the jurisdiction stripping language of Section 7 has no effect whatsoever on this court's remedial authority under the Ulbrichts Act. Because remember, the Ulbrichts Act is not a jurisdictional statute. It's simply codifying the court's inherent remedial powers in any case that is under its present or prospective or even former jurisdiction, right? Brits of Quorum know this happened after all other jurisdiction, after jurisdiction ordinarily would seem to expire. And those exist in the military, in the ordinary military system as well. So I think, you know, to the extent that Balboacha remains good law in this circuit and indeed was decided at a time before the Supreme Court decided Boumedia, and so that under the standing law of this circuit that the detainees had no causes – the courts had no jurisdiction over detainees, right? I certainly think the same analysis of the same statutory provision applies here. And I didn't see anything in the government's brief to distinguish that. The only other point I would make, particularly on the Section 7 point, is that Congress did codify precisely the provision you're talking about in the 2006 Act. Section 950J Bravo was a provision that said final judgments only. And it said the procedures, any challenge to the military commission's procedures, jurisdiction, what have you, may only be done pursuant to essentially the express terms of this statute. And this court, in fact, did rely on that in a case called Cotter, not the reported decision, but an unreported order in the Cotter case. This court summarily relied on that to dismiss any challenge to the military commissions. Congress, in the same law that created the Court of Military Commission Review as a court of record, repealed Section 950JB. And so I think to the extent the government is asking this court to revive Section 950JB, they are asking this court to ignore multiple of the reforms Congress made in 2009 in order to ensure that the military commissions had adequate appellate review and were ultimately perceived by the public to be legitimate. Well, we'll hear from them, but I think they're hanging their hat on the any action language in the 2009 Act, which I think is broad enough to shear away our jurisdiction now that you're seeking under the All Writs Act. I know they're hanging their hat on that. This court rejected that in Bilbao. In terms of a pleading to authority, I would rest on Bilbao for that proposition. But also, again, the Supreme Court's decision and the general decision in Dean Foods, but also the general notion that when statutes are either jurisdiction stripping or jurisdiction limiting, or particularly where they go at the court's inherent remedial authority, because remember, that's all a writ is. A writ has no ñ there's no independent jurisdictional basis for a writ. A writ is an exercise of this court's potential jurisdiction. And so that when Congress passes statutes that impinge on those, the courts do everything they can to require specificity and clarity. And as this court, again, held in Bilbao, nothing in Section 72 mentions the All Writs Act, touches extraordinary writs, or remedial ñ this court's remedial authority. So ñ and so I think ñ sorry. I mean, I take your point of Bilbao being before the 2009 Act. You're just making a broader point about the separate understanding of the All Writs power. Am I making a broader understanding? I mean, the language that the government is relying on is language in the 2009 Act that didn't exist at the time that this court decided Bilbao. No, that's not correct. The language the court is relying on is ñ was enacted in 2006. This is Section 72 of the 2006 Act. It was the ñ it's the habeas stripping provision that was up before the Supreme Court in Bermuda. This is just essentially a residual clause to that they've relied on. So for no further questions, I would simply just reiterate that these are systemically important questions that should be resolved now. They will poison and taint every case to come before this court over the next 10 years, and not these cases have been delayed long enough. If I can reserve the remainder of my time. Thank you. Mr. DePue. Good morning, Your Honors, and may it please the Court. My name is John DePue, and I'm an attorney with the National Security Division. Mr. DePue, if you pull the microphone up, the recording will catch it much better. As I said earlier, I'm an attorney with the National Security Division of the Department of Justice. At the outset, as Judge Pallard has noted, let's not lose sight of the fact that we are here on mandamus. And in order to issue the writ, the Court needs to determine that doing so is necessary and appropriate in aid of its ultimate jurisdiction. Neither of those criteria apply here. Nothing about the decision of the Court of Military Commission Review rejecting Petitioner's Appointments Clause claim will in any way, shape, or form affect this Court's ultimate ability to reach that issue if and when it reaches this Court. Let's suppose that this Court vacates the stay. The case is remanded by the CMCR to a military commission, and the military commission convicts the petitioner of any offense. If that conviction is affirmed by the CMCR and approved by the convening authority, Petitioner's Appointments Clause and Separation of Powers Clause will be squarely before this Court on plenary review. And this Court will have jurisdiction to address those issues? At that point, absolutely, Your Honor, because that will be a final judgment as approved by the convening authority and passed on by the CMCR as required under Section 950G of the Military Commissions Act. If, on the other hand, there is a prospect that the case will become moot as a result of the petitioner's acquittal, both of these claims will become moot, invoking the principle that this Court has followed in the Cisneros case, that you don't reach constitutional claims until it's necessary to do so. Assertion of mandamus jurisdiction is not appropriate because it is plain, from the plain language of the Military Commissions Act, from the plain language of Section 7E2 of the 2006 Act, and from the legislative history of that statute, that what Congress was trying to accomplish here was to let the military commission system function from the pretrial stage through appellate review by the CMCR, frankly, without piecemeal litigation and without intervention by the Article III courts. It reserved that intervention for cases where there was a conviction and where the conviction was affirmed by the CMCR. Now, let me talk briefly about this jurisdiction-stripping language that Judge Pillard had his colloquy with my friend about. Yes, it does indeed reach any action against the government or its agents relating to the trial, or any aspect of the trial, against an enemy detainee. As your colleagues, Judge Kavanaugh, observed in dissenting from your order issuing this day, the language of that provision falls squarely within the plain terms of the Act. This is indeed an action. It's a separate action from final review. In explaining what it intended in enacting that legislation, the legislative history of the 2006 Act, both the reports of the House Judiciary Committee and the House Armed Services Committee, say that what we mean to do is to preclude the courts from addressing any legal claim relating to a military commission other than those relating to the final judgment. And this plainly falls within that language as the Ninth Circuit recently recognized its counterclaim. So counsel's arguing that the anti-claim language was repealed. Oh, absolutely not, Your Honor. I would invite the Court's attention to the prefatory language of Section 2241E2. It says, except as otherwise provided, citing the DTA, the Detention Act, except as otherwise provided, it can't relate to anything. Well, the otherwise provided, when you look at the Detention Act, it involves final judgments. In the legislative history, the House report makes it absolutely clear that that is not intended to strip away this Court's jurisdiction with respect to final judgment review. But, Mr. Dupuy, in the Ninth Circuit case, they were bringing a separate declaratory judgment action. That's correct, Your Honor. Whereas here, your opponent has argued that we don't have a separate action, and that the language, of course, of 2241E2 is any action. Rather, what we have here is an exercise of our remedial authority under the All Rights Act. That's correct, Your Honor. I understand that argument, and my response to that is, whatever the theoretical underpinnings of mandamus jurisdiction may be, whether it's a separate action or whether it's ancillary to your ultimate jurisdiction, this is, this particular claim, that there's a violation of the Appointments Clause and a violation of the Separation of Powers Clause, that is, under the plain language of that statute, a separate action. Or, to use the words of the legislative history of the House report, a separate claim. And that's what the Court, that's what the Congress, sought to foreclose this Court from addressing prior to the point at which a conviction as affirmed resulted in. How do you respond to Bobaca? Oh, that's, I think, that's quite simple, Your Honor. Bobaca involved the appointment by the, by Judge Lamberth. Oh, let me talk about Bobaca a little bit in context. First, the Court, the Court since the Bobaca case, has repeatedly made it clear that Section 2241E2 does not reach claims sounding in habeas. So the first thing that this Court has done in Amer, in Cotter, in Ajanko, Zerini, is to look to see whether the underlying claim sounds in habeas when the government asserts that section. Well, if it does sound in habeas, that's the end of the matter. We don't get the benefit of that section. Now, Bobaca preceded that analysis. But it was very similar. In Bobaca, what happened is that during the pendency of the Court's granting certiorari in the Supreme Court's case involving Boumediene, and the decision in Boumediene, the government was threatening to deport Mr. Bobaca back to Algeria. Of course, if it was to do that, the Court would lose its jurisdiction. So what the Bobaca Court said was, we're going to look to see if this underlying claim sounds in habeas. Because if it sounds in habeas, you don't get the benefit of 2241E2. That's our preliminary step. The Court then went on to decide that the petitioner did indeed have a claim that sounded in habeas because he was challenging the legality of his detention. And the Court said, because it sounds in habeas, 2241E2 doesn't apply. We have the benefit of the All Writs Act. We can issue a writ here enjoining the detention, enjoining the removal of Bobaca. Well, this case, Your Honors, is not Bobaca. This case does not involve habeas. It involves a separate separation of powers, an Appointments Clause claim that had nothing whatsoever to do with Bobaca, which falls squarely within the terms of paragraph E2 and is not in any way, shape, or form necessary for the preservation of this Court's jurisdiction at that juncture. Now, having said that, I'd like to turn to the merits. Yes, Judge Pillard, did you have a question? I was just going to ask you to turn to the merits. Okay. So much for jurisdiction. Now, I think the criteria for habeas. I want to just caution Mr. Dupree, because I've been on these cases long enough. Yeah, I know. I had you once. Well, I can hear the government making an argument rejecting your concession before this Court regarding the adequacy of the direct appeal, and I want to be very clear that the government's position is that under this Court's final judgment jurisdiction, it can reach the Appointments Clause and the Commander-in-Chief Clause contentions that are presented today in support of mandamus. Oh, absolutely. And, of course, the standard is different, too. You don't get to have to deal with the mandamus standard. You do that de novo. So if we write saying that the government has conceded this and that this is necessary to our decision, so it's not dictum, that is consistent with the government's position? Yes, I certainly wouldn't call it a concession. I would simply say it's an acknowledgment that your jurisdiction under 950 G.B. would permit you to reach that issue, and I don't know why it wouldn't. All right. Let's then proceed to the merits. The criteria for habeas or mandamus jurisdiction are well established in this Court. First, petitioner must have no alternative other than relief, remedial relief at the pretrial stage. Now, the sole claim that my opponent, well, I heard my opponent make several arguments as to why that doesn't apply. First, he says that, well, this involves the ability of the appellate judges to sit. But as the Court explained in Cobell, the reason it found it necessary to assert mandamus jurisdiction in that case is because there was a claim of personal bias against Mr. Kieffer, who was appointed by Judge Lambert to serve as a court monitor. But, I mean, I thought the Court was getting at the district court's authority as well. In Cobell. Yeah, to issue the writ, issue the writ, to reach in and issue the writ. Well, in other words, I'm just suggesting that given that this CMCR is a court of record, I'm not clear why you want to frame your argument simply in terms of judicial partiality. I mean, your brief says, you know, doesn't make an absolute statement that that is the limit. This, as the case explained, the reason the courts ordinarily pass on those claims at the pretrial stage is because they simply cannot detect at the post-trial stage whether judicial partiality has impacted upon the judge's ruling. So they have to reach it in the pretrial stage before it can affect the proceedings. Now, there were indeed, as your Honor suggests, two parts of the Cobell case. And in that case, Judge Lambert appointed Mr. Kieffer to two positions. The first was as a court monitor to see how the Department of the Interior was Mr. Cobell serves as the court monitor. He appoints him as a special master. But during the time that he was acting as a court monitor, he so injected himself into the operations of the Department of the Interior, particularly with respect to the Indian Trust Fund, that the government deemed it necessary to step in to get him to stop. And it was because of the way he was acting, and not simply because he was appointed as a court monitor, but because of the way he was conducting his operations, precluding the Department of the Interior from conducting its operations, that the court found it necessary to step in. Now, during the time that Mr. Kieffer was serving as the court monitor,  he was acting, as the court described, as essentially the inspector general of the Department of the Interior, criticizing its activities. And what the court held is that you can't be a special master because the special master position is a judicial position. And you have an image of bias. You appear, for all intents and purposes, to be biased, and therefore you have to be disqualified under Section 455. Well, it's a separation of powers concern, right? Which is what the petitioner is arguing. We have here a separation of powers concern. So I just wanted to ask you that question. Why would the government not want a determination of the validity of this body before sinking its time and resources into something that may be vulnerable to a structural challenge eventually? First, Your Honor, I think what we want is kind of irrelevant. The court either has jurisdiction or it doesn't. And it's our submission that you want it. Well, let's say we think we have jurisdiction. I'm not saying that that's what I believe. But let's say, for the sake of delving into this aspect of the argument, that our jurisdiction is not removed for reasons that the petitioner relies on, Bill Botchett. And so then the question is, do we exercise the All Rights Act power under an eight-hour jurisdiction? And the question there is, you know, given the precedence that you're discussing that talk about whether the defect is a defect that you really need to change prospectively, I'm not sure there's a remedial position that you can offer us, assuming that there may be a defect under the Appointments Clause or the Commander-in-Chief Clause. Do you have a remedial position you can offer us that wouldn't unwind everything you would have done in the interim if we don't intervene now? Let me issue each one of those terms. There are questions in terms. First, with respect to the fact that this smacks of separation of powers, similar to one of the claims that's addressed here. It wasn't simply the fact that this was a separation of powers claim that caused this Court to exercise this main damus power. It was the fact that it was the way that Mr. Kiefer was conducting his operations that needed immediate remediation because he was frustrating the Department of the Interior in administrating the Indian Trust Fund. Well, they're making the argument it's frustrating the intent of Congress in passing the 2009 Act, creating a court of record. I mean, pressing their argument. And or violating the Constitution. I mean, the Appointments Clause has very grave interests that it serves that have to do with accountability and, you know, the formal participation of the two branches in the appointment of particular officers, be they principal or inferior. Of course, I'll get to that argument next. But the next step is, why wouldn't we want you, why wouldn't we like you to resolve this now? One, because you don't have jurisdiction. Two, because it's the overarching intent of Congress to avoid piecemeal litigation. And that's precisely what this is. Even on the assumption that Congress wanted a court of record with judges individually appointed and confirmed by the Senate? In other words, I thought that's not to restate, but that's the thrust of Judge Pillard's question, isn't it? Well, I will reach that argument in turn. That involves the separation of power. You're making a number of assumptions here concerning the statutory requirements that I don't think are warranted with all due respect. And I understand that. That's why I asked the question. Because I want to understand your answer. Again, the fact that this is a constitutional claim, the fact that it's an important issue is entirely beside the point. If you don't have jurisdiction, you don't have jurisdiction. Regardless of what we might like. No, the question was, assume we have jurisdiction for purposes of this question. That was Judge Pillard's question. Well, I would fall back on my second point then, that the overarching purpose of Congress was to avoid piecemeal litigation. And that's simply the answer. And that's our objective, too. But, of course, let's go on to the merits of the second point. I mean, we don't want to get into what is the government's objective, all right, in taking this position. It's got to be that the government is convinced that this court lacks jurisdiction and that is the end of the matter. Well, that's our first point with respect to Maine Damage, yes. Absolutely. But the point you were making is that were we to have jurisdiction, you believe that we should not exercise it because we'd have a full opportunity to reach this issue later on. That's correct. And so let's talk a little bit about the two claims that they've raised. I'm particularly interested in your position on the appointments clause. First of all, I think it's important enough that we not lose sight of the Mandamus framework. And what Mandamus jurisdiction means is that the court below was so wrong that it constituted an abuse of authority. Petitioner has not even attempted to explain how he thinks he can satisfy that standard here. Now, what we understand his claim to be relates to the appointment provision relating to appellate military judges on the United States Court of Military Commission Review, 10 U.S.C. 950-F. It provides something like this, and I'll just try to paraphrase, that the Secretary of Defense can assign from among the appellate military judges of the Armed Forces judges to serve on a part-time role on the United States Court of Military Commission Review. Now, the petitioner makes two claims in his brief related to that. First, he says that that makes them principal officers, and that as such, as principal officers, they need to be separately appointed and confirmed under the Constitution. It's difficult for us to understand how the Court of Military Commission Review could have been wrong in rejecting that claim when the action that occurred here falls almost squarely within the ambit of the Supreme Court's decision in Weiss. In Weiss, a claim was likewise made that the judges of the United States Marine Court, Navy Court of Review, by virtue of their assignments, needed a reappointment because they were assuming different responsibilities. On a court of record? Well, I don't think that matters in the least. Well, it certainly does. Well, they called this a court of record. They didn't call that a court of record. That's what Congress called it. It calls this a court of record. Yes, and so they argue it's a fifth Article I court. It's another Article I court, but the point of the Weiss case was that... And Weiss wasn't dealing with such courts. I think the analysis is still the same, and it doesn't change in the least. What the Weiss court held was, first of all, the Weiss court did not look at the question whether these were principal or subordinate officers, or principal or inferior officers. Right, but it also didn't look at whether it was a court of record, whether it was an Article I court. So you can argue it's persuasive, but it's not binding on this issue. No, but they're both Article I courts. Which is the both? The United States Navy and Marine Court of Review. It's not a merely administrative body. It performs judicial functions. It has judicial responsibilities. The court found that by virtue of these officers' appointments as commissioned officers and confirmations as principal officers, that was all that was necessary to warrant their assignment to the Navy and Marine Court of Review. The court didn't consider in one way, shape, or form whether they were principal or inferior officers. It didn't need to, as I said, by virtue of their appointments and confirmations. Would you agree the court would have had to have considered that if Congress had said we're creating an Article I court? No, I wouldn't. I don't think it matters. I thought so, yeah. All right. So your position is that the U.S. Court of Military Commission Review judges are inferior officers. I don't think we need to reach that question, Your Honor. My position would be that they were appointed by the President and confirmed by the Senate. And under Weiss, that's all that's required. But Weiss, as you can see, did not deal with appointment of individuals in that posture to a role of a principal officer. So under your argument, it's a very sweeping argument that I don't think we have precedent on, either from the Supreme Court or this court directly, that would say that somebody who's an assistant attorney general doesn't need separate confirmation to be assigned to be the attorney general or someone who's assistant secretary of state could be secretary of state without a separate appointment. Well, certainly they couldn't make a major general the secretary of agriculture. You're saying that germane is the only limitation on that? Yes, I would suggest that, yes. And I think that comes through both in the Weiss majority opinion and in Justice Scalia's concurring opinion. And the reason that he signed on to the majority opinion was because of the germaneness analysis, which I think applies with equal force here. Now, my opponent points out the fact that Congress creates thousands of second lieutenants every year. That's not the case with these officers. Both of these officers were confirmed to the grade of colonel. Along with a thousand others, right? No, not along with them. When was Lieutenant Colonel Ward, what is his appointment history? He was appointed... Where would we find it? You would find it in the congressional record, which is on a footnote in our brief. Okay, let me talk a little bit about Lieutenant Colonel Ward. Lieutenant Colonel Ward is now retired from the armed forces. Lieutenant Colonel Ward was never a member of the merits panel in this case. Lieutenant Colonel Eric Krause, United States Army, is a member of this panel. Lieutenant Colonel Jeremy Winter is a member of this panel. I think the source of confusion, and I hate to verge here from my analysis, is the fact that Colonel Krause had recused himself from involvement in the Cotter case. Cotter sought to intervene in this case. Because Colonel Krause had recused himself from acting in the Cotter case, he also recused himself on the question of intervention, and the court substituted Lieutenant Colonel Quincy Ward on that single issue. But if you will look at the order of the United States Court of Military Conventional Review denying the appointments clause claim, Lieutenant Colonel Krause signed that order. Now let me talk a little bit about the appointment history of these officers. Now my opponent says that thousands of officers are promoted each year, and that's probably right. Every time a West Point graduating class in my day came up in June, Congress would send a list of all these officers. In the case of Colonel Krause, he was confirmed by the Senate in 2011. Twenty-five officers were on that board, were on that list. In 2011, rather. Lieutenant Colonel Weber was appointed and confirmed to the grade of colonel in 2014. Eighteen officers were appointed to that, were selected for promotion on that board. Incidentally, the promotion list identified them as judge advocates. Certainly, in the context of the Military Commissions Act, having been enacted in 2006 and revised in 2009, as Justice Souter acknowledged in his concurring opinion, there was a very reasonable probability that one of these officers was going to get involved in this matter. Indeed, as Colonel Winthrop pointed out in his monumental treatise, since the Revolutionary War, military officers have been involved in adjudicating war crimes litigation. Today, every commissioned officer from the lowest second lieutenant or ensign to the chief of staff of the Army are responsible for administering the law of war. Mr. DePue, if, just indulge an assumption, if it made a difference in our deliberation, whether now or at a later time, whether the judges on the Court of Military Commission Review are principal officers or inferior officers, how do you contend with, and this is a bit unusual as a military court, because, as Judge Rogers was saying, it's designed to be a court of record. It gives a lot of independence and finality to these judges. The only review from their decisions is to this court. They are protected against removal except for good cause or military necessity, and there's a statutory safeguard against anyone taking action against them within the executive branch, and that's a very central criterion in our Appointments Clause jurisprudence, whether someone is supervised by another officer or is instead the principal officer kind of at the top of the heap. So let's say it mattered to your position that these judges are, in fact, not principal officers. How would you make that case? First of all, before I answer that question, let's not lose sight of the fact that we're on mandamus jurisdiction, and our function here is to determine whether the court below was completely off the reservation in relying upon the Wise case. Certainly an argument can be made that they are inferior officers if we had to make that argument. We didn't make it. We didn't take a position one way or the other. They're appointed by the—they're appointed by the—or assigned, rather, by a member of the cabinet, not by the president. They're removable by a member of the cabinet, not by the president. And they are, in a very real sense, an intermediate appellate court. Maybe not by an Article I court as in the case of the members of the military appellate court, but they are an intermediate appellate court. Indeed, if finality is the determinant, there are many officers in the military commission process that have some final say with respect to whether a case goes forward in the military commission system. Military judge, enter a finding of not guilty. Military officers on the court, can acquit. So, I think it's important to understand that, as Justice Souter pointed out in his concurring opinion, that these factors, none of them are determinative, and that when the question is close, because they are not determinative, it's up to Congress to have the say, and that we should defer to Congress unless the Congress is completely off the ranch on that. It would have been helpful had Congress spoken more definitively on this, but I think you're right in pointing to various indicia. On the one hand, well, I won't go through them, but it's not entirely clear or explicit what Congress intended by creating these offices. And I guess it would be helpful to us, given that this is our precedent, for you to address with some specificity the implications of the intercollegiate broadcasting case, the case dealing with the copyright royalty judges. Well, of course, the court held in that case, as I recall, that based upon the, among other things, the removability and the finality of the judges or whatever they were on that court, that they were, in fact, superior officers. But I would simply point out that, unlike this case, they were not appointed and confirmed by the president, so it really isn't terribly helpful. If I may, let me turn very briefly to... Do you have any more questions? No, I can't. Let me see what else I need to talk about here on that. Your time is up. No more questions. Does Mr. Parrott have any time left? All right. Just to quick clarify, just in case I was misunderstood, Judge Rogers, you asked if a section or part of Section 72 was repealed. I believe some of it was abrogated after Boumediene was struck down. I was specifically referring to Section 950JB. And so was I. Okay. I'm sorry. I just wanted to make sure. I'm clear. Okay. Yeah. And also with Valboccia, the government doesn't discuss it in their brief. I commend the court to read it. It was decided at a time, again, I must repeat, before the Supreme Court reversed this court in Boumediene. And so anyone who has had experience with the cases at that time, there was no judicial review anywhere for anything. It was simply because given that the Supreme Court may reverse it, there was potential jurisdiction, just as this court has potential jurisdiction over the final judgment in this case now, that the courts retained some residual remedial authority until that potential jurisdiction was finally extinguished by the Supreme Court. So, again, I just commend this court to reading that in terms of analyzing the 2241E2 question. The government repeatedly complained about this being piecemeal litigation. And that's a little galling because it is the government who took this appeal. It is the government who stopped al-Nashiri's military commission midstream, stopped it because al-Nashiri had succeeded for the first time in all military commission history of having a charge dismissed from a case for lack of jurisdiction. And it was the government who chose to stop the case and take it up to the CMCR  And so if anyone has pieced up the meal, it is the government, and we are simply trying to make sure that if the government is going to do that, that they try him right the first time and not the third time. I guess in terms of addressing this court's and my friend's specific arguments about why this is just completely answered by Weiss, I think this court's questions pointed up to the major problems. But I think it is important to just do an inventory of the differences between the criminal courts of appeal and the armed forces and the CMCR. The courts of criminal appeal are created by the judge advocates. Judge advocates are authorized by statute to create these essentially as review boards. Yes, they have judicial functions, but they are fully within the chain of command. And that was true, I should say, under the 2006 Act. The body, the CMCR's predecessor under the 2006 Act, was created by the Secretary of Defense. So that parallelism was true under 2006. The problem is 2009 creates it as a standalone, independent, congressionally created court of record. So what if the remedy were to remove the restrictions on the supervision and removal of these judges and make it clear that they are inferior and not principled? That would solve your any grand or chief concern that you have and also solve the appointments problem right under Weiss and everybody could go home. Well, what you're saying, Your Honor, is we can strike down one part of the statute or the other. And striking down the independence provision, I think, in this context is contrary to congressional intent. Because remember, in thinking about severability, which is what this is about, it's about Congress's intent. And it's clear that Congress intended this to be an independent court. That's why it went to the trouble of reforming the Act. Well, it's a little unclear. I mean, I think there are some indications to the contrary. For example, given the Supreme Court's precedence, the use of the term assign in reference to the military judges versus appoint under subsection 3, which isn't limited to the civilian judges, but, you know, there's a contrast there. So the assignment would suggest that maybe these are supposed to be inferior officers just merely assigned. Undoubtedly. I don't think the government would agree, but I think if there's a problem, everyone agrees Congress made one mistake. It made one of two mistakes. It either made a mistake in thinking that it could create a fifth independent court of record, or it made a mistake in thinking that it could assign military officers to that court. The assignment of military officers, I should point out, was something of a holdover from the prior law. And I think the legislative history certainly suggests that the retention of this authority to assign military officers as well was as much just a feeding forward of the prior Act, primarily because the 2009 Act had a separate section later on in the Act being very careful to say that appointments made under the prior appointments or assignments made under the prior Act are hereby ratified. They didn't want to disrupt what were ongoing cases. And so to the extent that Congress retained the option for military officers, I think it was as much administrative as anything else. And ultimately, again, this court is forced to strike down something we clearly know Congress was insisting upon, because that was the major reform of the 2009 Act was to make this an independent court of record with judicial independence. Well, there's independence and there's independence. I mean, there's an independent counsel who's not a principal officer and who has independent in the title of her office. Sure. But remember, the independent counsel is assigned to very discrete tasks. Oh, I know. There are other crafts for differentiation. But I'm just saying the fact that there was an interest here in independence. I mean, the Office of Legal Counsel does independent legal advice, but it's under the attorney general and the president and, you know. Well, that may be so. But I think Congress's overriding interest in independence was clear. And the only other example. It points towards principal officer status. It points towards principal officer status. And I would make the one example is Congress contemplated abolishing the CMCR in favor of the CAF. You said you were going to give a roster of sort of features that differentiate. Yes. Yes, I'm sorry. So, yes, removability obviously is one that we've discussed. But I think the other two are expectations of the office to be able to render final judgments for the United States on the most controversial national security cases in a generation. Certainly is something we want the most politically sort of insulated individuals in our government to do. And additionally, and I think this is a major difference, again, from the courts of criminal appeals, is the line of review. Their decisions are reviewable nowhere else in the executive branch. Their decisions are reviewable only here. And in the Edmund, which is really the essential case on the status of these courts of criminal appeal in the military, that was a decisive factor for the Supreme Court, including Justice Scalia, was the idea that you can't have all of the decisions, excuse me, all of the decisions of the CCAs were reviewable either by the Court of Appeals of the Armed Forces, which is within the executive branch, or by the Judge Advocate General, which is also within the executive branch. And what about the fact that the Secretary of Defense can, in fact, rescind punishments needed out by this body or sustained by this body? There is some vacation authority within the executive branch. Yes, the Secretary of Defense can vary. Well, no, I don't think that's correct. I think it would only be through the clemency process after the CMCR Act. Because once the CMCR acts, you have a final judgment that is only subject to this court's review. And, again, taking your point just because of something my friend said, every other actor in the military commission system who renders any kind of final judgment is subject to reversal within the executive branch. And, again, the essential piece for the Appointments Clause is having executive control and accountability for the decisions that are made on behalf of the United States, the most important and unreviewable decisions made by the United States. And so the idea that Congress can sort of writ large appoint thousands or even 18 inferior officers and then give a menu to the President and say, pick any of these for the most consequential and unaccountable positions in our government, strikes at the core of what the Appointments Clause is about. And I would draw, finally, Your Honor, just an analogy to the line-item veto. It's the same accountability problem that you have in the line-item veto cases, where you have Congress essentially abdicating its responsibility to make the hard choices and be accountable for individual appointments or, in the line-item veto context, spending, by giving the President a buffet from which to pick. And that's inconsistent certainly with the history and rationale of the Appointments Clause, as well as its text and the relevant case law. And we think that is clear for purposes of mandators. All right. Thank you.
judges: Henderson, Rogers, Pillard